## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

JOSELUIS SAENZ,

      Plaintiff,

v.                                  No. CIV 03-232 MCA/LFG

DEPARTMENT OF THE INTERIOR,

      Defendant.

## MAGISTRATE JUDGE'S ANALYSIS
## AND RECOMMENDED DISPOSITION[1]

### Introduction

THIS MATTER is before the Court on Plaintiff Joseluis Saenz's ("Saenz") Application for

Attorneys' Fees and Costs Pursuant to 28 U.S.C. § 2412 and Memorandum in Support Thereof, filed

December 2, 2002 [Doc. No. 37.]  The motion is fully briefed, and there is no need for oral argument.

[Doc. Nos. 40, 45, 3.][2]  Saenz seeks a total award of fees and costs, including gross receipts taxes,

in the approximate amount of $74,800.00.  After carefully considering the pertinent law and the

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

[2]On February 21, 2003, this case was transferred from a miscellaneous matter number 99-M-21 to a civil case number No. CIV 03-232.  The Honorable E. L. Mechem originally heard the miscellaneous matter and ruled in favor of Saenz.  On August 5, 2002, the Tenth Circuit Court of Appeals affirmed Judge Mechem's decision.  Subsequently, Saenz filed the present application for attorney's fees.  The pleadings from 99-M-21 were moved to No. CIV 03-232 and are numbered 1-46.  Most of those pleadings are not scanned and are found in paper form in No. CIV 03-232.  In addition, No. CIV 03-232 contains another series of pleadings, numbered 1-5, including the original Complaint [Doc. No. 1] filed in 99-M-21, several other pleadings pertaining to the application of fees, and an Order of Reference by the Honorable M.C. Armijo referring Saenz's application for fees and costs to the undersigned United States Magistrate Judge for a recommended disposition.  [Doc. No. 5 in No. CIV 03-232.]

parties' arguments, the Court recommends that the fee application be granted in part and denied in part as explained below.

## Procedural and Factual Background

The procedural and factual history of this case is important to the Court's analysis of the government's position and the ultimate question of whether attorney's fees and costs are appropriate in this case. Much like the Ninth Circuit indicated in United States v. Antoine,[3] 318 F.3d 919, 920 (9th Cir. Jan. 31, 2003), the underlying dispute here "pit[ted] the federal government's efforts to save the bald eagle from extinction against the bird's profound significance to Native spirituality."

Saenz is a lineal descendant of the Chiricahua Apache. Based on Saenz's beliefs in the traditions and religion of his tribe, he performs as a religious and ceremonial dancer at sacred American Indian ceremonies and dances. Saenz possesses and uses eagle feathers as part of his traditional and religious practices. For example he adorns his religious ceremonial outfit and various other items and pieces of clothing with eagle feathers. [Doc. No. 3, 99-M-21, Amended Motion for Return of Property Seized. . . .]

The Chiricahua were once considered as a federally recognized Apache tribe, and there once was a Chiricahua Reservation. However, since about 1886, the Chiricahua were no longer accorded such federal recognition. [Id.]; United States v. Hardman, et al., 297 F.3d 1116, 1119 (10th Cir. 2002).[4] The fact that the Chiricahua are not a federally recognized tribe bears on the question of

---

[3]The Court also finds Antoine factually distinguishable. Antoine was a member of a Band of the Salish Indian Tribe in British Columbia. He obtained dead eagles in Canada and brought feathers or other parts into the U.S. where he swapped them for money and goods. He claimed that his actions were part of the native custom of "potlatch," which to him had religious significance. Id. at *1.

[4]In his thorough Memorandum Opinion and Order, entered March 13, 2000, Judge Mechem provided a more detailed explanation of the Chiricahua Apache's history and the government's failure to recognize them as a separate, independent Native American tribe. [Doc. No. 25 in 99-M-21.]

whether Saenz was legally entitled to possess and use eagle feathers in his religious practices.  Federal

law provides that "[t]he Secretary of the Interior may grant permits [for possession and use of eagle

feathers] to 'members of Indian entities recognized and eligible to receive services from the United

States Bureau of Indian Affairs . . . engaged in religious activities . . . ."  Hardman, 297 F.3d at 1123

(citing 50 C.F.R. § 22.22).

In Hardman,[5] the Tenth Circuit provided the following factual background with respect to

Saenz's case.

> In 1996, while New Mexico state officials were executing a search
> warrant at Mr. Saenz's home as part of an investigation unrelated to
> this case, the officers noticed items with eagle feathers hanging on the
> walls.  Mr. Saenz had obtained these feathers as gifts in connection
> with various ceremonies.  After contacting the U.S. Fish and Wildlife
> Service and determining that Mr. Saenz did not have a permit for the
> feathers, the officers seized the items and sent them to the Fish and
> Wildlife Service office in Albuquerque.  In March 1997, the
> government brought criminal charges against Mr. Saenz under the
> BGEPA, 16 U.S.C. § 668(a) [Bald and Golden Eagle Protection Act],
> but the charges were dismissed on the government's motion in July
> 1997.  After attempting to retrieve his feathers through administrative
> proceedings, Mr. Saenz filed a motion in federal district court [before
> Judge Mechem] under Fed.R.Crim.P. 41(e) for the return of property
> seized by a search warrant.  Mr. Saenz initially brought his claims
> under the BGEPA and RFRA [Religious Freedom Restoration Act],
> the Free Exercise Clause, and the Equal Protection Clause.  The
> government moved to have the 41(e) motion treated as a civil
> complaint, but the district court denied the government's motion.  The

---

[5]Hardman addresses three separate cases, two of which (Hardman and Wilgus) were criminal convictions for the illegal possession of eagle feathers.  Hardman was not of Native American descent but was a practitioner of a Native American religion.  Wilgus also was not of Native American descent, but practiced a Native American religion.  As stated above, Saenz was a lineal descendant of the Chiricahua Apache but the Chiricahua are not a federally recognized tribe.  Saenz was originally charged but ultimately not prosecuted criminally.  However, his eagle feathers were seized and eventually forfeited.  The cases initially came to three separate panels of the Tenth Circuit.  "Because of conflicting panel outcomes and the factual and legal similarities among the cases, we simultaneously issued and vacated the panel opinions, and then sua sponte ordered that the cases be reheard en banc."  Hardman, 297 F.3d at 1118.  The Tenth Circuit remanded as to Hardman and Wilgus and affirmed as to Saenz.  Id.

> district court granted Mr. Saenz's [Rule 41(e)] motion and ordered
> the return of the feathers.   The court did not consider the
> constitutional grounds, and based its decision entirely upon the
> BGEPA and RFRA.  The United States appealed, arguing that the
> district court's analysis under RFRA was erroneous.  The United
> States also argued on appeal that the district court failed to give
> deference to the Secretary of the Interior's interpretation of
> the BGEPA's exception for "Indian tribes," as required by Chevron
> U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S.
> 837 (1984).  A panel of this court [the Tenth Circuit] found for Mr.
> Saenz under RFRA, and affirmed.

Id., at 1119-20.

After the Tenth Circuit issued its August 5, 2002 decision affirming Judge Mechem's opinion,

Saenz's application for attorney's fees and costs followed.  Although Judge Mechem typically would

be the judge assigned to review this application for fees and costs, he passed away in 2002.

### Analysis

Section 2412 of Title 28 of the United States Code governs the question of what fees, costs

and expenses a prevailing party may be awarded in a civil action brought by or against the United

States or any agency of the United States.  28 U.S.C. § 2412(a)(1), 28 U.S.C. § 2412(d)(1)(A).

## I.   ATTORNEY'S FEES AND SUBSTANTIAL JUSTIFICATION

Section 2412(d)(1)(A) of the Equal Access to Justice Act ("EAJA") provides the following

with respect to an award of attorney's fees:

> Except as otherwise specifically provided by statute, a court shall
> award to a prevailing party other than the United States fees and other
> expenses, in addition to any costs awarded pursuant to subsection (a),
> incurred by that party in any civil action (other than cases sounding in
> tort), including proceedings for judicial review of agency action,
> brought by or against the United States . . . unless the court finds that
> the position of the United States was substantially justified or that
> special circumstances make an award unjust.

4

28 U.S.C. § 2412(d)(1)(A).

Here, the government does not dispute that Saenz is the prevailing party, that his application for fees was timely, or that he is a qualified individual under § 2412(d)(2)(B).  [Doc. No. 45, p. 9.] However, the United States opposes any award of attorney's fees on grounds that its position was substantially justified.  The government also argues that even if the Court determines its position was not substantially justified, the proposed fees are excessive and must be reduced.  Finally, the government opposes many the proposed expenses and costs.

The EAJA statute does not define the phrase "substantial justification."  However, in Pierce v. Underwood, 487 U.S. 552, 565-66 (1988), the United States Supreme Court examined the meaning of "substantial justification" in relation to § 2412(d).  "That phrase does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  (internal citation omitted).  Thus, the phrase does not mean "justified to a high degree," "but rather 'justified in substance or in the main'– that is, justified to a degree that could satisfy a reasonable person."  Id. at 566.  "The term means more than 'merely undeserving of sanctions for frivolousness.'  'But a position can be justified even though it is not correct, and . . . it can be substantially (i.e., for the most part) justified if a reasonable person could think it correct, that is, if it has a reasonable basis in law and fact.'"  Hadden v. Bowen, 851 F.2d 1266, 1267 (10th Cir. 1988) (quoting Pierce, 487 U.S. at 566 n. 2.)

The Tenth Circuit, in Hadden, provided the following guidance in determining a fee application question with respect to whether the government's position was substantially justified.

> In determining whether the government's position was reasonable, the
> trial judge must make a separate review of the government's position
> to determine whether it was substantially justified.   .  .  .  The

5

> government's success or failure on the merits at each level may be
> evidence of whether its position was substantially justified, but that
> success or failure alone is not determinative of the issue.

Id. (internal citations omitted).  The Supreme Court advised that both objective criteria, e.g., the stage in the proceedings at which the merits were decided and the views of other courts on the merits, should be considered, along with other factors, depending on the present case.  Pierce, 487 U.S. at 568-69.  Further, the Court examined the actual merits of the government's litigation position, along with applicable statutory language.  Id. at 569-70.

In addition, in examining the "position of the United States," the Court analyzes not just the government's actions in the civil case, but also the action or failure to act by the agency upon which the civil action is based . . . ."  28 U.S.C. § 2412(d)(2)(D).  The United States bears the burden of establishing that its position was substantially justified.  *See*  Hadden, 851 F.2d at 1267 (discussing "substantial justification" in terms of social security case).

Here, the Court finds each of the factors discussed below to be key in its determination that the government's position was not substantially justified.  First, the U.S. Fish and Wildlife Service's opposition to Saenz's possession of the eagle feather derived solely from Saenz's purported non-Indian status, or in other words because he was not a member of a federally-recognized tribe and could not be such a member.  [Doc. No. 45, p. 11.]  The government did not dispute that Saenz was participating in bona fide tribal religious ceremonies.  *See* United States' opposition brief. [Doc. No. 45, pp. 10-14.] (Government argued only that eagle feathers were properly seized because Saenz undisputedly was not a member of a federally-recognized tribe.)

The BGEPA intends to protect the bald eagle from extinction and states that "[w]hoever, without being permitted to do so ... shall knowingly ... take, possess, sell, [or] purchase . . . any bald

6

eagle commonly known as the American eagle, or any golden eagle . . . or any part, nest, or egg thereof . . . shall be fined $5,000 or imprisoned not more than one year or both." 16 U.S.C. § 668. The BGEPA does not set forth exceptions to this rule, nor does it expressly provide for permits allowing for eagle part use under certain circumstances. The related regulations do, however, provide for exceptions and permits. An individual may not possess, etc. eagle parts unless a permit is obtained from the federal government. Harding, 297 F.3d at 1122-23 (citing 50 C.F.R. § 22.11.)[6] Permits may be issued to members of Indian entities recognized and eligible to receive services from the U.S. Bureau of Indian Affairs . . . engaged in religious activities. 50 C.F.R. § 22.22. A permit is not automatically issued even when these criteria are met. The government has the discretion to consider the effect the permit will have on the bird populations and whether the applicant is participating in bona fide religious ceremonies. 50 C.F.R. § 22.22(c). Moreover, demand for eagle parts and feathers far exceeds supply and there may be wait period of several years even for successful applicants. Harding, 297 F.3d at 1123.

Technically, the government was within its right to prosecute Saenz for the possession of eagle feathers, as Saenz does not belong to a federally recognized tribe. However, the government dropped the misdemeanor charge against Saenz in consideration of "the unique circumstances of [Saenz]." [Doc. No. 40, p. 11.] The government (through the U.S. Fish and Wildlife Service), instead, elected to seek only administrative forfeiture of the feathers themselves. The Court questions the substantial justification of the decision to proceed with forfeiture when it rather quickly decided

---

[6]In Harding, the Tenth Circuit explains in detail the applicable federal statutes and related regulations that were at issue in the underlying case. The Court merely summarizes those laws and statutes here.

not to prosecute Saenz based on "unique circumstances" – circumstances that had to have been present with respect to both proceedings.[7]

The government's efforts to administratively forfeit the eagle feathers and related items was flawed from the outset. As noted earlier, the government dismissed its criminal charges. The Fish and Wildlife Service's ("FWS") first administrative forfeiture of the feathers in 1997 failed for lack of notice. [Doc. No. 25 in 99-M-21, p. 4.] Even though FWS had Saenz's correct address, it attempted to provide notice to the wrong address, and Saenz was not apprised of the forfeiture proceeding. Thus, he had no opportunity to be heard or to defend. FWS then proceeded with the forfeiture action and obtained an administrative forfeiture order that was void for lack of due process. [Id.] In August 1999, some three years after the seizure, the FWS re-filed a Notice of Proposed Forfeiture, approximately one month after Saenz filed his Fed.R.Crim.P. 41(e) Motion for Return of Property.

Judge Mechem found inexcusable delay on the part of the FWS in bringing a proper forfeiture action, unreasonableness on the part of the agency in retaining the eagle feathers without a proper and legal forfeiture proceeding, and irreparable, grave harm being caused to Saenz in the interim. [Id., p. 5.] Judge Mechem also concluded that it was highly likely that the FWS's second notice of forfeiture was prompted solely by Saenz's request for the return of the seized property rather than the FWS's belated desire to provide Saenz with fair and prompt legal notice. [Id.] This Court determines that the agency's failure to promptly and properly act favors a finding that the

---

[7]Indeed, the only unique circumstances present were that Saenz is an Indian, although not a member of a federally recognized tribe; that he is a practitioner of a Native American religion; that he uses eagle feathers and eagle talons as part of his adherence to his sincere and genuine religious beliefs.

government's position in opposing Saenz's request for the return of his property lacked substantial justification.

Moreover, the government's decision not to prosecute Saenz based on his "unique circumstances" undermines the government's position that it somehow viewed Saenz as a "non-Indian." So, too, the government's failure to dispute that Saenz was a lineal descendant of the Chiricahua Apache tribe, a sincere practitioner of his Native religion and a follower of those Native beliefs and traditions, undermines its position. Indeed, Judge Mechem stated that "[t]he government's refusal to find Saenz to be an Indian practicing an Indian religion ignores plain facts, belittles religious beliefs and unreasonably restricts the access to eagle feathers intended by the exception to the BGEPA." [Id. at 15.]

In his opinion, Judge Mechem also observed that in other cases where the government was successful in precluding an individual from possessing eagle feathers for Native religious purposes, it was clear that the individuals truly were non-Indians. [Doc. No. 25, p. 7.] Thus, this was not a situation where the government pointed to a number of cases, with nearly identical facts, that it had successfully defended. *See* League of Women Voters of California v. F.C.C., 798 F.2d 1255, 1258 (9th Cir. 1986). *See also* Pierce, 487 U.S. at 569 (string of losses or successes in other cases might be indicative of whether the government's position was substantially justified).

Finally, not only did Judge Mechem refer to various aspects of the government's position as unreasonable, other parts of the opinion highlight his apparent conclusion that the government was proceeding unreasonably.

> In the end, it appears the present permit system is designed not to enhance the government's position with federally-recognized tribes, to serve tribe's governmental purposes, to implement the statutory

9

> exception in the fairest manner possible, or to place the least constraint on the free exercise of religion; the present permit system appears to minimize the work Congress has handed the agency. Administrative expediency, however, does not constitute a compelling governmental interest that justifies either intrusion into religious beliefs or regulations which unreasonably restrict express statutory provisions.   None of what the government presents in this case justifies denying an Indian practitioner of an Indian tribal religion access to eagle feathers.

[Id., p. 20.]

The Court is aware that Saenz's success on the underlying merits is not dispositive of whether the government's position was substantially justified.  However, the tenor of Judge Mechem's opinion strongly supports a finding here that the District Court Judge, who was in the best place to observe the two-day hearing and related proceedings, did not find the government's position to be reasonable, either in law or fact, or both.

Additionally, this Court notes that the government's attempt to gain discovery into the underlying matter (which presumably might have assisted the government in strengthening the reasonableness of its position) was more of an afterthought, at best.  One day before Judge Mechem held the scheduled hearing, the United States moved to treat Saenz's criminal Rule 41 motion as a civil complaint so that it could engage in discovery.  [Doc. No. 9, in 99-M-21.]  Ultimately, this request was denied, after the hearing was held.  The government again raised this argument in its appeal to the Tenth Circuit, but only in a footnote in its en banc brief.[8]  The Tenth Circuit concluded that Saenz had not been placed on notice that this issue would be considered on appeal.  Hardman,

---

[8]Given the fact that the trial court was critical of the government's failure to present evidence to challenge Saenz's presentation, the United States could have made the refusal to allow civil discovery a significant part of its defense before the trial court and a significant part of its appeal.  However, the issue was relegated to a single footnote in its en banc appellate brief and the circuit afforded the claim no weight because it was not specifically raised in the appeal.

297 F.3d at 1131.  The government's inadequate attempts to gain discovery, as well as its failure to preserve and pursue the issue, gravitate against the reasonableness of its position.

The Tenth Circuit's affirmance of Judge Mechem's decision, while again not dispositive, constitutes additional objective criteria, supporting a finding that the government's position was not substantially justified.  First, the Tenth Circuit clearly distinguished Saenz's position from that of the other two appellees (Hardman and Wilgus), who were of non-Native American descent.  Id. at 1118-20, 1131-32.  Second, the Court observed that while it might typically give weight to certain persuasive authority cited by the government it could not do so based on the "poorly developed record in the cases at hand."  Id. at 1131.  The record was devoid of hard evidence to support the government's position.  Id. at 1132.

More specifically, the record contained no evidence to support the government's position that increased permit applications would place increased pressure on eagle populations.  Id.  The data that was provided by the government was described as "largely irrelevant"  because the government emphasized a comparison of federally recognized tribes versus the number of Americans who identified themselves as having Indian ancestry.  The Court viewed the more relevant comparison to be between those members of federally recognized tribes who held the eagle feather sacred and other persons who held a sincere religious belief that the eagle feather was sacred.  Id.

Throughout the opinion, the Tenth Circuit observes that the government failed to answer questions that were incumbent upon it to answer, failed to provide an adequate record on key questions and generally left far too many questions unanswered.  *See id.* at 1133-34.  Instead, the government asked the Court to speculate and to make presumptions, both of which the Court declined to do.  Id. at 1132, 1133.  The lack of evidence presented by the government with respect

11

to Saenz was fatal to its case.  Id. at 1135.  Thus, the Tenth Circuit affirmed Judge Mechem.  Id. at 1136.  While the Court did not expressly state that the government's position was unreasonable, this Court again finds that the government's lack of support for its position at the appellate level belies its contention of substantial justification.

Moreover, the government's opposition brief [Doc. No. 40] fails to provide any additional evidence or argument to convince the Court otherwise.  In its brief, the United States primarily argues that it took its position in the Saenz matter based on previous challenges and/or analogous challenges decided by other Courts.  The first case cited by the government, Gibson v. Babbitt, 223 F.3d 1256 (11th Cir. 2000), was decided after Saenz brought his motion to recover the eagle feathers and after Judge Mechem issued his ruling but before the Tenth Circuit affirmed Judge Mechem.  Thus, the government could not have relied on this case prior to its appeal of Saenz since Gibson had not been decided.  Moreover, unlike the Tenth Circuit's findings in Saenz, the Eleventh Circuit in Gibson observed that the government met its evidentiary burden with respect to the pertinent legal questions. 223 F.3d at 1258.

In its oppositional brief, the United States also relied on a number of earlier decided cases as evidence that its position was substantially justified.  However, most of these cases are distinguishable for various reasons.  The United States v. Hugs, 109 F.3d 1375 (9th Cir. 1997) decision, cited by the United States, did not address a situation where the individuals were not members of a federally recognized tribe.  Instead, the individuals in that case apparently were members of a federally recognized tribe but had not applied for a permit to trap, shoot at, and kill eagles, which they freely admitted they had done.

United States v. Eagleboy, 200 F.3d 1137 (8th Cir. 1999), also cited by the government, primarily addressed a challenge as to selective prosecution rather than the permit regulations as they applied to religion.  The Court also finds that several other cases cited by the government simply do not support its position.  For example, United States v. Jim, 888 F. Supp. 1058 (D. Or. 1995) and United States v. Thirty Eight (38) Golden Eagles or Eagle Parts, 649 F. Supp. 269 (D. Nev. 1986), aff'd, 829 F.2d 41 (9th Cir. 1987), did not address challenges to the regulation that excluded Native Americans from applying for permits based on criteria that the Native Americans belong to federally-recognized tribes.  Instead, in these two cases, enrolled members of federally-recognized tribes brought the challenges.  Finally, the Court also considered United States v. Antoine, which the government supplied as supplemental authority in support of its position.  Clearly, the case was decided after the appeal here and could not have been relied upon by the government to support its position in Saenz, and additionally, the Court has found it distinguishable.  See supra, fn. 3.

Therefore, after a careful review of all of the circumstances, along with the pertinent law, this Court concludes that the government's position, including the FWS's underlying actions or inaction, was not substantially justified.  In other words, the government did not satisfy its burden of showing that its position had a reasonable basis in law and in fact.[9]

---

[9]This is not to say that the United States acted entirely without justification.  It is clear that Saenz did not have a permit and did have eagle feathers and eagle parts.  It is also clear that the government was acting to enforce an agency regulation that limited issuance of permits to members of federally recognized tribes, and that Saenz would not have been issued a permit even if he had applied.  The Court's decision was based, in part, on the failure to adequately tailor a regulation to Native Americans with genuinely held religious beliefs that require the use of eagle feathers as part of their religious rituals.  Given the presumptions of correctness afforded agency regulations, the United States could have made a far stronger case than it did.

## II.   REASONABLENESS OF ATTORNEY'S FEES

Having found that the government's position was not substantially justified, the Court now addresses the government's argument that the requested fees are excessive.  The EAJA provides:

> "fees and other expenses" include the reasonable expenses of expert witnesses, the reasonable cost of any study, analysis, engineering report, test, or project which is found by the court to be necessary for the preparation of the party's case, and reasonable attorney fees (The amount of fees awarded under this subsection shall be based upon prevailing market rates for the kind and quality of the services furnished, except that (i) no expert witness shall be compensated at a rate in excess of the highest rate of compensation for expert witnesses paid by the United States; and (ii) attorney fees shall not be awarded in excess of $125 per hour unless the court determines that an increase in the cost of living or a special factor, such as the  limited availability of qualified attorneys for the proceedings involved, justifies a higher fee.)

28 U.S.C. § 2412(d)(2)(A).

EAJA authorizes courts to award "reasonable" attorney's fees.  Role Models America, Inc. v. Brownlee, 353 F.3d 962, 968 (D.C.Cir. 2004).  The starting point for determining the amount of a reasonable fee is to calculate the number of hours reasonably expended and to multiply that number by a reasonable hourly rate.  Ramos v. Lamm, 713 F.2d 546, 552 (10th Cir. 1983), *abrogated on other grounds by* Pennsylvania v. Delaware Valley Citizens Council for Clean Air, 483 U.S. 711 (1987).[10]  The applicant bears the burden of establishing entitlement to an attorney's fee award, documenting the appropriate hours expended, and showing that the hours expended are reasonable.  Case v. Unified Sch. Dist. No. 233, 157 F.3d 1243, 1249 (10th Cir. 1998).  Essentially, this means

---

[10]While the Court refers to EAJA case law concerning the fee determinations, case law arising under other fee-shifting statutes also may be helpful.  Role Models America, Inc., 353 F.3d at 968 (*relying on* Indep. Fed'n of Flight' Attendants v. Zipes, 491 U.S. 754, 759 n. 2 (1989) (fee-shifting statutes' similar language is a strong indication that they are to be interpreted alike.))

that the applicant must "prove and establish [the] reasonableness of each dollar, each hour, above zero." Jane L. v. Bangerter, 61 F.3d 1505, 1510 (10th Cir. 1995).

The Tenth Circuit has made clear that the attorneys of prevailing parties who seek attorney's fees:

> must keep meticulous, contemporaneous time records to present to the court upon request.  These records must reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks--for example, how many hours were spent researching, how many interviewing the client, how many drafting the complaint and so on.

Ramos, 713 F.2d at 553.  Block billing, or lumping tasks into a single entry of time, while not favored is not *per se* forbidden.  Cadena v. Pacesetter Corp., 224 F.3d 1203, 1215 (10th Cir. 2000).  Courts may discount requested attorney hours if the attorney fails to keep the required records or if the records are sloppy and imprecise.  Id.; Jane L., 61 F.3d at 1510.

In addition, the Tenth Circuit recognizes that attorneys typically do not bill a client for every hour expended in litigation, and that attorneys should exercise "billing judgment" regarding the amount of hours actually billed.  To show appropriate billing judgment, an attorney should make a good-faith effort to exclude those hours from the request that are excessive, redundant or otherwise unnecessary.  Ellis v. Univ. of Kan. Med. Ctr., 163 F.3d 1186, 1202 (10th Cir. 1998).  The Court has a corresponding obligation to exclude hours "not reasonably expended" from the calculation.  Id.

In analyzing what hours are "reasonably" expended on specific tasks, the court may consider such factors as the "complexity of the case, the number of reasonable strategies pursued, and the responses necessitated by the maneuvering of the other side."  Case, 157 F.3d at 1250.  The Court also may examine whether the hours that were expended constituted a duplication of efforts by other

15

attorneys.  "For example, [if] three attorneys are present at a hearing when one would suffice, compensation should be denied for the excess time." Id. (quoting Ramos, 713 F.2d at 554)).  In making this determination, the court can look to how many attorneys the other side utilized in similar situations.  Id.

The Court may accept the lodestar proposed by Plaintiff as the reasonable amount to award or it may adjust the lodestar upward or downward, depending on the circumstances of the case.  See Louisiana Power & Light Co. v. Kellstrom, 50 F.3d 319, 324 (5th Cir. 1995) (citation omitted), cert. denied, 516 U.S. 862 (1995).  In  reducing the lodestar, the Court may elect to discount requested fees by specific billing entry/hour or by making a general reduction of hours "to achieve what the court determines to be a reasonable number."  Case, 157 F.3d at 1250 (internal citation omitted); Hensley v. Eckerhart. 461 U.S. 424,  436-37 (1983) ("no precise rule or formula" required for determining attorney fee awarded to prevailing party)

Here, Saenz makes the following applications for attorney's fees in the total amount of $32,327.50 for the underlying (pre-application for fees) work performed at the law firm of Rothstein, Donatelli, Hughes, Dahlstrom, Schoenburg, & Frye, LLP:

(1) Peter Schoenburg, lead counsel, $125/hour.  Total requested: 174.9 hours, $21,737.50.

(2) Brian Pori, $120/hour. Total requested: .1 hour, $12.50.

(3) Terry Storch, $120/hour.  Total requested: 69.5 hours, $8,340.00.

(4) Carolyn M. Nichols, $120/hour.  Total requested: 16.7 hours, $2,087.50.

(5)  R. Hughes, $125/hour.  Total requested: 1.2 hours, $150.00.

Saenz also requests the following attorney fees in an additional amount of $27,250.00 for the underlying work done by directors and student attorneys at the Indian Law Clinic at the University of Colorado School of Law.

(1) law students, $50/hour.  (Arbaug, Kalish, Bogan, Garcia, Huff, Christ, Emsden).  Total requested: 220.00 hours, $11,000.

(2) directors of law clinic, $125/hour.  (DeCoteau and Krakoff)  Total requested: 130 hours, $16,250.00.

Finally, Saenz requests attorney's fees related to this application for fees in the amount of $5,382.50.

(1)  C. Nichols, $120/hour.  Total requested: 41 hours, $4,920.00.

(2)  P. Schoenburg, $125/hour.  Total requested: 3.7 hours, $462.50.

In its opposition to Saenz's application for fees, the government does not object to any of the hourly rates claimed and notes that while the maximum allowable rate under the EAJA is $75.00 per hour, the requested hourly rates do not exceed the amount that is properly adjusted for cost of living increases.[11]  The government's failure to object is not dispositve.  The Court has an independent obligation to evaluate the application, to determine the necessity of the time spent and the reasonableness of the application.

The government does, however, object to the fee request, based on the number of attorneys and number of hours utilized.  Saenz submitted fee requests for five attorneys with Mr. Schoenburg's firm (although some of those requests involve very small amounts of time) and requests for work

---

[11]The Court does not address the need to make a cost of living adjustment to the hourly rate because the maximum allowable EAJA rate was amended upwards some years ago.  *See* discussion *infra*.

performed by directors and law students at the University of Colorado Indian Law Clinic.  The government primarily objects to the fees requested by the Colorado Law Clinic, to the extent that they overlap or duplicate activities of New Mexico counsel.  The government specifically requests that the total fee application of New Mexico and Colorado counsel be reduced from $59,577.50 to $38,065.00 (allowing for some work done by Colorado counsel).[12]  In his reply, Saenz argues, through affidavit testimony from the former Law Clinic Director that the work on this case was appropriately divided between the Albuquerque firm and the Law Clinic and that there was no overlap.

A.   *Hourly Rates*:

In earlier years, the EAJA set a maximum rate of $75 an hour for counsel but this maximum fee was raised to $125 per hour for cases commenced on or after March 29, 1996.  Courts also may adjust that rate upwards to compensate for an increase in the cost of living.  28 U.S.C. § 2412(d)(2)(A)(ii).  Here, it appears that Saenz mistakenly believes that the $75/hour cap is still in place, but that maximum has been increased since Saenz filed his 1999 motion.  In any event, the Court concludes that the hourly rates of $125 for Schoenburg and Hughes respectively (Hughes submits one billing entry) are appropriate.  In addition, the other attorneys' billing rates of $120 also are appropriate.

B.   *New Mexico Law Firm's Fees:*

The New Mexico attorneys' billing records, while contemporaneously prepared and somewhat detailed, contain many instances of block billing.  (e.g., Schoenburg's 9/1/99 entry that appears to

---

[12]This figure does not reflect the later added fees requested for the fee application itself which are addressed *infra*.

begin with conference call with Boulder; telephone conference with S. Siemel; work on preparing for hearing: 2.3 hours; similar time entries for 9/7/99, 9/8/99, 11/5/99, 11/11/99, 5/15/00, 5/16/00, 5/23/00[13], 7/16/00/ 7/18/00, 3/6/01, 3/9/01; Storch's entries for 10/19/00, 10/24/00, 11/14/00, 10/30/00, 11/2/00, 11/4/00, 11/5/00, 11/6/00; Nichols' entries for 11/4/00, 11/20/00, 11/25/00, 11/26/00, 11/27/00). While lumping tasks together is not *per se* prohibited, it makes it difficult to determine what amount of time might have reasonably been expended on a certain task.  As a result, block billing like this prevents a client of a reviewing court from determining if too much time was spent on any single task.

In addition, the Court notes that there appears to be some amount of duplication both between and among New Mexico attorneys, and between the New Mexico attorneys and the Colorado Law Clinic.  For example, the Tenth Circuit brief, that was being prepared in late 2000, appears to have been worked on by many people, including DeCoteau in Colorado and Storch in New Mexico, possibly Schoenburg in New Mexico and R. Hughes in New Mexico.  (DeCoteau entries for 10/16, 10/18-19, 10/27, 11/5; Storch entries for 11/3/00, 11/4/00, 11/5/00, 11/6/00, 11/9/00; Schoenburg entries for 10/29/00, 10/30/00, 11/8/00, 11/11/00, 11/12/00, 11/13/00; Hughes entry for 11/12/00). It is conceivable that each of these four attorneys might have been responsible for the research and writing of discrete areas of the brief, and yet nothing in the billing entries allows the Court to make such a determination.  Thus, it looks like many skilled attorneys all prepared and reviewed the same brief.  That is the kind of duplication that cannot be compensated.

---

[13]These billing entries are made more difficult to read as one day's entry often appears to run into the next entry.

It also appears that in 1999, Schoenburg and DeCoteau, along with a law student, attended the hearing before Judge Mechem and billed for that time. It is not clear, however, what roles the two attorneys each played. It does not appear from the time records that DeCoteau conducted any of the witness examinations at the hearing, but the time records are less than clear on that point. One block entry for DeCoteau indicates that she spent 14 hours traveling to Albuquerque for the hearing, preparing witnesses, reviewing briefs, legal arguments. The law student from Colorado billed 16 hours for travel and a meeting, 8 hours the next day for the hearing and meeting and 16 hours for the next day's hearing, meeting and travel. The Court would not conclude that the use of two attorneys during a two-day hearing in a case such as this would be prohibited, and yet, the time entries simply fail to apprise the Court of how each attorney's time was spent, or why the services of two attorneys and the clinical student were necessary. Indeed, Judge Mechem denied the clinical law program's request to allow student participation at the hearing and denied the motion to reconsider. Thus, it is impossible to make a determination of the reasonableness of the time billed in some instances. *See, e.g.,* Karnes v. SCI Colorado Funeral Services, Inc., 166 F.3d 347 (TABLE, text in Westlaw), 1998 WL 879479 (10th Cir. 1998) (finding that the preparation of two attorneys for cross-examination and assistance in jury selection overlapped and warranted a reduction in fees).

The Court determines here, in view of the multiple uses of block billing, instances of duplication of efforts and vague billing entries that preclude the Court from assessing the reasonableness of certain billing, that the New Mexico attorneys' billing entries should be reduced by 15% in order to arrive at a reasonable fee. Thus, the total fee to be awarded for New Mexico counsel is $27,478.38.

C.    *Colorado Law Clinic Fees:*

The Colorado Law Clinic also submitted billing entries by different attorneys and law students, seeking reimbursement for a total of $27,250.00.  The billing entries by both attorneys and students are so inadequate that they provide virtually no assistance in determining the reasonableness of time spent.  For example, attorney DeCoteau bills for "phone calls to Albuquerque," "phone calls to Flagstaff and Las Vegas" to "read briefs," "calls to Peter Schoenburg," "letter from Terry," "calls to potential witnesses,"  multiple entries for nothing more than "phone calls" (each entry denoting one hour), "conference with Justin and Ryan," "conference call-Peter, Terry," four hours to "prepare for hearing," "gather travel receipts/travel report," "review draft brief," "call to co-counsel," "faxes and calls to co-counsel,"1.5 hours to review Mechem's final order, .5 hour to review media coverage of case, "meet Laranne--review draft outline," "meet Laranne," five hours to "review/revise brief; calls, faxes" and three hours to attend oral argument with Laranne.  Some of the entries are not properly compensable, for example time spent contacting the media or time spent faxing materials.  However, most of the entries are so vague that it simply is impossible to make any sort of determination as to the reasonableness of time spent.

The billing records of the students are equally vague, if not more so.  Most of these student records contain no student name and no year next to the month and date.  Some billing entries state nothing more than "phone calls," "outline," "research/write."   There are other entries that state "talked to Ms. Storch" (for .5), research for 2.5 hours, review cases and statute for 2.5, organize file for .2, memo .5, and drafting memo for 9.0.  Without specific detail, the Clinic is hard pressed to justify what appear to be a an excessive number of hours spent by students on this matter, and thus, the Court is unable to justify an award for the total time spent.  The Court does not infer that the

Clinic has billed for time not actually devoted to the case by clinical students, but rather, the amount of time spent on particular tasks appears excessive.

The affidavit submitted by Ms. DeCoteau was intended to assist the Court in making the reasonableness determinations.  However, that affidavit states only that the students worked very diligently at writing research memos, drafting large parts of briefs, assisting in the preparation of witnesses and researching.  Ms. DeCoteau does provide summaries of specific work provided by different students, and yet the vague billing records for students cannot be matched up in any helpful way with DeCoteau's descriptions.

The Court recognizes that a Law Clinic's participation in such a case provides a significant learning opportunity for law students.  Indeed, the District of New Mexico sponsors a clinical law federal practice program based on the Court's belief that clinical experience is a valued and necessary part of a student's training.  However, students must learn how to supply appropriate time and billing entries as well as to perform the substantive legal work.  Here, the billing records from the Colorado Law Clinic are woefully deficient.  They are not the kinds of records that clients would accept for billing purposes, nor are they the kind that the Court will accept.  Thus, the Court determines that the Colorado Law Clinic's billing records should be substantially reduced due to the inadequate records submitted in support of the fees application.  Because the court is unable to determine if the application is adequately supported due to the inadequate records, the Law Clinic's fees should be reduced by 70% in order to arrive at a reasonable figure.  The total fee to be awarded to the Colorado Law Clinic is $8, 175.00.

    **D.**    ***Attorney's Fees for Fee Application***

       Attorneys for the applicant are entitled to fees for time spent preparing a fee application. Mares v. Credit Bureau of Raton, 801 F.2d 1197, 1205 (10th Cir. 1986); Love v. Mayor, City of Cheyenne, Wyo., 620 F.2d 235, 237 (10th Cir. 1980). Here, Saenz seeks the total amount of $5,382.50 for the application of fees. Most of the work was done by Attorney Nichols in the New Mexico office. It also appears, however, that one of the Colorado attorneys submitted billing related to the attorney fee issue. The Court does not re-visit the Colorado Law Clinic's submission for fees on this issue since the applicant did not appear to separate out the fee application issue from the Clinic's general work. That fee application work, like the rest of the Law Clinic's work, is reduced by 60% as was explained above.

       With respect to the New Mexico attorneys' billings on the fee issue, Nichols' entries suffer from some of the same block billing inadequacies as were described above. For example, on December 3, 2002, Nichols billed 6.4 hours for a conference, edit/writing, another conference, a telephone conference, online research, another conference, follow up on-line research, and so on. Again, this makes it difficult to determine what time was spent on each task and whether that time was reasonable.

       However, the Court concludes that Nichols' entries generally are sufficiently detailed to make a determination that the hours spent on the fee request are reasonable. Thus, the Court does not reduce the amount of hours requested. The total fee awarded is $5,382.50.

**III.**    **EXPENSES AND/OR COSTS**

       Regarding a judgment for costs, §2412(a) refers to 28 U.S.C. § 1920 and states:

> costs may be awarded to the prevailing party in any civil action
> brought by or against the United States or any agency . . . of the
> United States . . . . A judgment for costs when taxed against the
> United States shall, in an amount established by statute, court rule, or
> order, be limited to reimbursing in whole or in part the prevailing
> party for the costs incurred by such party in the litigation.

28 U.S.C. § 2412(a)(1).  Section 1920 provides that a judge or clerk of any federal court may tax as

costs:

> fees of the clerk and marshal, fees of the court reporter for all or any
> part of the stenographic transcript necessarily obtained for use in the
> case, fees and disbursements for printing and witnesses, fees for
> exemplification and copies of papers necessarily obtained for use in
> the case, docket fees under § 1923, and compensation of court
> appointed experts, compensation of interpreters, and salaries, fees,
> expenses, and costs of special interpretation services under § 1828.

28 U.S.C. § 1920.

In addition, a prevailing party shall be entitled to recover "other expenses" under 28 U.S.C.

§ 2812(d), in addition to fees and costs (awarded under 28 U.S.C. § 2812(a)).  "Fees and other

expenses" are defined to include the "reasonable expenses of expert witnesses, the reasonable cost

of any study, analysis, engineering report, test, or project which is found by the court to be necessary

for the preparation of the party's case, and reasonable attorney fees."  28 U.S.C. § 2412(d)(2)(A).

Saenz applies for a total of $7,717.95, with respect to the following miscellaneous costs,

expenses and work performed by paralegals and law clerks:

Paralegals, $60/hour.  (D. Callis and A. Chavez)  Total requested: 28.5 hours, $1,710.00

Law clerks, $50/hour.  (E. Anderson and T. Fobbinder).  Total requested: 8.4 hours, $420.00

Westlaw charges: $1,218.66

Long distance charges: $172.13

Postage: $211.27

Document reproduction: $1,417.78

Misc. costs: $2,511.36

Fax charges: $56.75

Saenz also requests $1,879.04 in gross receipts taxes related to the underlying attorney's fees, and gross receipts taxes in the amount of $312.86 related to the application for fees. Thus, the total costs, expenses and gross receipts taxes are: $9,909.85.

The government does not object to an award of fees for the paralegals and law clerks, but makes various arguments as to why many of the other expenses and/or costs should be reduced or denied. In sum, the United States asserts that Saenz should receive no more than $216.55 for costs plus the fees for paralegals/legal assistants.

### A.     *Paralegal/law clerk fees:*

Notwithstanding the government's failure to object to the billings by paralegals and legal assistants, the Court still must ascertain whether the billing entries and rates are reasonable. *See* Robinson v. City of Edmond, 160 F.3d 1275, 1285-86 (10th Cir. 1998) (court has discretion to reduce fee request, even where the parties have not placed a fee request in controversy). *See also* Hensley, 461 U.S. at 433-34 (court has duty to independently review request for fees and expenses claimed under EAJA); Odenhouse v. Commodity Credit Corp., 922 F. Supp. 489, 494 (D. Kan. 1996) (court still reviews submitted fees even where there is lack of opposition). *But cf.* United States v. Eleven Vehicles, Their Equipment and Accessories, 200 F.3d 203, 211-12 (3d Cir. 2000) (well settled in the Third Circuit that district court may not award less in fees than requested unless the opposing party challenges fee request).

25

Callis, apparently a paralegal, submits some entries with block billing, including the entry for November 10, 2000.  Anderson, apparently a law clerk, submits an entry with block building and several entries regarding communications with or about media coverage and TV appearances. Fobbinder, a law clerk, submits a single billing entry for "brief legal research."  Some of these entries clearly are not reimbursable costs or expenses, particularly those concerning media and TV coverage. Other entries are vague in that they provide only block billing.  Thus, the Court will reduce the paralegal/law clerk expenses by 15% to arrive at a reasonable figure.  The total award of costs or expenses with respect to paralegal/law clerk billings is $1,810.00.

      **B.**    ***Other Expenses and/or Costs***:

The case law is divided on the scope of expenses recoverable under 28 U.S.C. § 2412(d)(2)(A).  Some courts have viewed the list set of reimbursable expenses under § 2412(d)(2)(A) to be exclusive, and yet the list is prefaced by the word "including" those expenses that are then enumerated.  In Weakley v. Bowen, 803 F.2d 575, 580 (10th Cir. 1986), the Tenth Circuit appeared to take a very narrow view as to what expenses could be recovered under EAJA in finding that no costs for travel expenses or postage fees would be authorized.  The federal district court in Kansas noted that the Tenth Circuit's decision on this issue was made without any analysis and that its reading of the statute was extremely cramped.  Robinson v. Sullivan, 719 F. Supp. 1012, 1014 (D. Kan. 1989).  "This court cannot believe that Congress intended the definitional section to be read exclusively rather than inclusively."  Id.  Indeed, as noted by the Kansas federal district court, at least four other circuit have determined that travel and deliver costs would be included in recoverable "other expenses."  Id.

A number of other courts have held that expenses will be reimbursable under the EAJA if they are of the type customarily charged to the client, as long as they are necessary to the preparation of the case. Vaughn v. Heckler, 860 F.2d 295 (8th Cir. 1988); International Woodworkers, Local 3-98 v. Donovan, 792 F.2d 762, 767 (9th Cir. 1985); Aston v. Secretary of Health and Human Services, 808 F.2d 9, 12 (2d Cir. 1986). However, expenses that are part of a firm's overhead, for example secretarial costs, are not recoverable.  Willkett v. I.C.C., 844 F.2d 867, 875-76 (D.C.Cir.), *reh'g denied*, 857 F.2d 793 (1988); United States v. Adkinson, 256 F. Supp. 2d 1297, 1319-26 (N.D. Fla. 2003).  *See also* Role Models America, 353 F.3d at 974-75 (authorizing some Westlaw charges).

Here, the government takes a very narrow view on what costs or expenses may be recovered under the pertinent EAJA provisions.  The United States agrees to a total of $216.55 in costs, including federal clerk copy charges, cost of one copy of a transcript, and docket fees.  The government also points to a number of discrepancies in the claimed Westlaw charges.

In his reply brief, Saenz agreed to reduce his costs and expenses by $176.55 which constitutes duplicate billing.  Saenz also attempts to explain the Westlaw billing date discrepancies through an affidavit by the firm's administrator.

Clearly, Saenz bears the burden of demonstrating the need and reasonableness of the costs and expenses that are being claimed.  The Court concludes that the Westlaw charges of $1,218.66 are reasonable and will be awarded.  However, the long distance charges of $172.13, beginning as early as June 1998, will be discounted by 20 %, resulting in a cost award of $137.70.  Saenz provides no actual link that these calls concerned his case, and the billing entries state nothing more than "Long Distance Charges."  Similarly, Saenz's requested costs for postage and document reproduction, beginning in March 1998, state nothing more than "Postage" or "Document Reproduction.".  This

minimal information does not allow the Court to determine what costs were actually necessary to the preparation of this case.   Thus, the postage charges of $211.27 will also be reduced by 20% ($169.02), and the document reproduction charges of $1417.78 will be reduced by 20% ($1,134.22). The Court reaches a similar result with the "Fax Charges" totaling $56.75.  They will be reduced by 20% ($45.40).   The total costs to be awarded, including Westlaw charges, is $2,705.00.

Saenz also submitted a list of miscellaneous costs totaling $2511.36.  The Court finds the following costs on that list to be reimbursable:  state court copy charges ($8.05), federal filing fee ($20.00), federal court copy charges ($20.00), transcript of proceedings from motion hearing ($176.55), Schoenburg 2001 travel, lodging and meals to Tenth Circuit ($755.28), and Schoenburg travel and lodging to Denver for oral argument ($378.14). Other listed items will not be awarded either because Saenz failed to provide evidence of their necessity to the case or because the Court could not determine from the entries, what relation the billing had to the case, e.g., "Cash for Bond," "Albuquerque Legal - Copy Charges."   The total miscellaneous costs to be awarded is: $1,358.02.

### C.    Gross Receipts Tax:

Saenz seeks gross receipts tax in the total amount of $2191.90.  Gross receipts taxes are typically passed onto a client as part of an attorney's routine billing practice.  Therefore, the Court will authorize gross receipt taxes at a rate of 5.8125% for a total of $1,910.04, based on the fees actually awarded.  Thus, the total award of costs, including paralegal/law clerk billings, Westlaw charges, "other expenses" and gross receipts taxes is $7,783.06.

**Attorneys' Fee Award and Costs/Expenses**

Based on the above-stated findings, the Court recommends the following fee award:

| | | |
|---|---|---|
| Attorney Fees: | Albuquerque Attorneys: | $27,478.38 |
| | Colorado Law Clinic: | $ 8,175.00 |
| | Fee Application: | $ 5,382.50 |
| Costs/Expenses: | All categories | $ 5,873.02 |
| Gross Receipts: | Underlying Litigation & Fee Application | $ 1,910.04 |
| **GRAND TOTAL:** | **Fees, Costs, Expenses:** | **$48,818.94** |

**Recommended Disposition**

That Saenz's Application for Attorneys' Fees and Costs Pursuant to 28 U.S.C. § 2412 [Doc.

No. 37] be granted in part and denied in part, as is further explained herein.

_____
Lorenzo F. Garcia
Chief United States Magistrate Judge